## UNITED STATES ex rel. GHERSIN v. COMMISSIONER OF IMMIGRATION AT PORT OF NEW YORK.

(Circuit Court of Appeals, Second Circuit.   March 13, 1923.)

No. 199.

I. Aliens ⊚⇒54—Inquiry preliminary to literacy test.

A board of inquiry is not required, before applying the literacy test, to expressly inquire whether the alien is seeking entry to the United States to avoid religious persecution, in which case he is exempted from such test, but a general inquiry as to his reason for coming to the United States is sufficient.

2. Aliens ⊚⇒54—Denial of exemption from literacy test held justified.

Where an immigrant testified that she came to the United States to join her intended husband, who prepaid her passage, it was not error to refuse to exempt her from the literacy test on her subsequent claim that she came to avoid religious persecution in the country of her last permanent residence.

3. Aliens ⊚⇒53—Temporary admission under bond applies only in case of physical disability.

The provision of Immigration Act Feb. 5, 1917, § 21 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼kk), for admission of aliens under bond, applies only to aliens subject to exclusion because of physical disability or liability to become a public charge.

Appeal from the District Court of the United States for the Southern District of New York.

Habeas corpus, on the relation of Anna Ghersin, against the Commissioner of Immigration at the Port of New York.   From an order denying the writ, relator appeals.   Affirmed.

Eugene I. Yuells, of New York City (Joseph G. M. Browne and Barnet E. Kopelman, both of New York City, of counsel), for appellant.

William Hayward, U. S. Atty., of New York City (Morris Streusand, Asst. U. S. Atty., of New York City, of counsel), for appellee.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge.   This is an appeal from an order dismissing a writ of habeas corpus sued out by the relator.   The relator is a subject of the kingdom of Roumania, who embarked at Rotterdam, Holland, for the United States and arrived at the port of New York on September 12, 1922.   Upon her arrival here she was subjected to the illiteracy test by a board of special inquiry held at Ellis Island, New York harbor, on September 12, 1922.   At the conclusion of the hearing she was excluded as being illiterate, being unable

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

to read, and she was ordered deported. An appeal from that order was taken to the Secretary of Labor, and on such appeal the Assistant Commissioner of Immigration at the Port of New York, in making the return on appeal, recommended that the excluding decision be affirmed. The Second Assistant Secretary of Labor affirmed the decision and directed the relator's deportation.

Thereupon, and on October 6, 1922, a petition for a writ of habeas corpus was filed. It alleged that the order of deportation was an abuse of discretion and an excess of power on the part of the immigration authorities, for the reason that the provisions of the Immigration Act respecting the literacy test are not applicable to the relator, for the reason that she is exempt from the operation of that test; she being an alien seeking admission to the United States to avoid religious persecution in the country of her last permanent residence. It was also alleged that the relator did not have a full, fair, and complete hearing before the board of special inquiry, as no inquiry was at any time made of her to inquire whether she was seeking admission to the United States to escape and avoid religious persecution in the country of her residence, and as the board failed to inform her of her right to apply for temporary admission under bond.

The petition also alleged that the relator, a young woman of 23 years of age, is of the Jewish faith and a native of Roumania, and that in that kingdom persons of that faith are subjected to religious persecution, as is evidenced by repeated acts of violence and assault and battery upon persons of that faith, and also by destruction and pillage of their property without interference or hindrance or restriction by the police or other public authorities, and by a system of terrorization which the said public officials and inhabitants of her country and her village have repeatedly participated in, and that they have also declared that persons of the Jewish faith were not wanted in the kingdom of Roumania and in the village in which she resided, and that said persons must leave the country or be put to death, and that such conditions have prevailed there and continued from the time of the war to the time of the relator's leaving the country for the United States.

The petition also alleged that the relator, if deported and returned to the country from whence she came to the United States, would be subjected to great and severe hardship for the reasons mentioned, and for the further reason that there is no industry in her village or in the immediate vicinity or surrounding territory wherein she could obtain employment or engage in any occupation to earn a livelihood, and that the sole relative which the relator has residing at said named place is an aged and poverty stricken aunt, wholly and utterly unable to take care of or make any provision for her. The petition further alleged that the relator has relatives in the United States who are financially able and willing to support and maintain her until she is capable of supporting and maintaining herself, and that there is no likelihood of her becoming a public charge.

In support of the petition for the writ and traversing the return of the respondent, the relator filed an affidavit in which she stated that

she came to the United States to avoid religious persecution in the country from whence she came. She also stated the fact to be that religious persecution is practiced in the kingdom of Roumania and in the village of Harlou, Roumania, her last permanent residence, both by overt acts of violence upon the Jewish populace as well as by a denial to them of privileges of education and employment accorded to persons of a faith other than that of the Jewish faith and in support thereof, deponent alleges the fact to be that persons of the Jewish faith were assaulted and beaten and robbed by the non-Jewish population in her village, and that this condition continued without interference by the police or other authorities in said village, and indeed on many of the occasions when such assaults and robberies took place some of the officials of the village participated therein, and terrorized the Jewish population, and took an active part in the assault upon them and in the theft of their property. Her affidavit continues as follows:

"That this condition of affairs was repeated at frequent intervals and continued throughout the period of the war, and continued thereafter and on an occasion about a month before deponent's departure from the said village, and about midnight, the non-Jewish population of said village, together with some of the constables and soldiers whose quarters were in said village, entered the home of deponent and other persons of the Jewish faith in the said village; and violently assaulted them and forcibly took away from them their personal property, and in addition broke up and destroyed such property as they could not carry away with them, continually shouting that the Jews were not wanted in Roumania, and that the Jews must get out of the country, and if they did not get out would be put to death. Deponent further says that she knows of her own knowledge that persons of the Jewish faith are denied educational opportunities in Roumania, or educational instruction of any kind, and that discrimination in employment is also practiced against persons of the Jewish faith; that some miles from the village of Harlou the Roumanian government maintained a free school of instruction to which persons of other beliefs, other than that of the Jewish faith, were admitted, but that persons of the Jewish faith were expressly denied admittance.

"Deponent was not permitted to enter the said school or to receive instruction there, because of the fact that she was of the Jewish faith, and although deponent applied for admittance she was informed that she could not be admitted, for the reason that the Roumanian government conducted these schools for persons other than those of the Jewish faith. Deponent states that, if she is compelled to return to the place of her last permanent residence, she would suffer grave hardship, for the reason that she has no one there except an aged and impoverished aunt, who is utterly unable to support deponent, and deponent would be unable to secure employment because of the discrimination practiced against persons of the Jewish faith, and further than this there is every likelihood that deponent would be brutally assaulted and her life put in danger because of the persecution of persons of the Jewish faith as heretofore stated."

Section 3 of the Immigration Act of February 5, 1917 (39 Stat. c. 29, pp. 874, 875 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼b]), provides that, in addition to the aliens who are now by law excluded from admission into the United States, persons shall also be excluded from admission thereto who are over 16 years of age physically capable of reading, who cannot read the English language or some other language or dialect including Hebrew or Yiddish. It, however, further provides:

"That the following classes of persons shall be exempt from the operation of the illiteracy test, to wit: All aliens who shall prove to the satisfaction of the proper immigration officer or to the Secretary of Labor that they are seeking admission to the United States to avoid religious persecution in the country of their last permanent residence, whether such persecution be evidenced by overt acts or by laws or governmental regulations that discriminate against the alien or the race to which he belongs because of his religious faith. * * * "

And rule 4 of the Immigration Laws governing the reading test, subdivision 6 thereof, reads as follows:

"*Method of Determining Right to Exemption.* All claims to exemption from the operation of the illiteracy provisions of the Immigration Act, shall be made the subject of careful inquiry by the examining inspector, who, if he is not convinced that the applicant is entitled to exemption, shall detain him for investigation by a board of special inquiry. *In all cases in which the exemption claimed is not fully established before such board, the alien, if illiterate shall be debarred.*"

Subdivision 7 reads as follows:

"*Proof of Exemption.* Clear and convincing proof of claims of exemption from the illiteracy test shall be required in every instance."

[1, 2] The proceedings before the board of special inquiry are in the transcript. It appears that the relator, having been duly sworn, testified that she came to this country to join her intended husband, and get married, and remain permanently in the United States; that her intended husband prepaid her passage; that she had known him about three years; and that he had been in the United States over two years. She said she intended to be married as soon as possible. The intended husband was also examined, and testified that he had been engaged to the relator a couple of months, that he paid her passage money, and that it cost him $116, including the head tax.

Neither the relator nor the intended husband, in the testimony before the board, had a word to say as to religious persecution in Roumania. If that had been the real reason, or even one of the reasons, why the relator left her home to come to the United States, it was her duty to have said so when she was asked as to her reason for coming. It was not until after her exclusion, and presumably after she had consulted with counsel, that the claim was made that the reason for her coming to this country was to escape religious persecution. There was no affirmative duty imposed on the board so to conduct the inquiry as to expressly ask whether she was leaving her country to escape religious persecution. It was quite sufficient to ask the reason for her coming to the United States in general terms. As she failed to mention the subject at the inquiry, we must assume that the real reason for her coming to this country was not religious persecution, but marriage. In view of the undisputed fact that she failed to pass the literacy test, we think she was property excluded. The relator had a full, fair, and complete hearing before the board of special inquiry.

[3] The objection is untenable that the failure of the board to inform the relator that she could apply for temporary admission under bond constituted error. Section 3 of the act, after specifying certain classes of persons to be excluded, provides that persons may be ex-

cluded who are comprehended within any of the excluded classes previously mentioned therein, who are found to be and are certified by the examining surgeon as being "mentally. or physically defective, such physical defect being of a nature which may affect the ability of such alien to earn a living." In the case of this relator no such certificate by an examining surgeon was given, and the alien was not excluded on the ground that she might be unable to earn a living. Her exclusion, as we have seen, was based on the fact that, while she was physically capable of reading, she was unable to read English or any other language.

Section 21 of the Immigration Act of 1917 (Comp St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼kk) provides that:

"Any alien liable to be excluded because likely to become a public charge or because of physical disability other than tuberculosis in any form or a loathsome or dangerous contagious disease may, if otherwise admissible, nevertheless be admitted in the discretion of the Secretary of Labor upon the giving of a suitable and proper bond," etc.

As the relator was not excluded on the ground that she was liable to become a public charge, section 21 was not applicable, and relator was not entitled to apply for temporary admission under bond. The board, therefore, could not have informed her that she was entitled to make application for admission under bond; the act making no provision for such an admission in the case of one excluded for failing to pass the literacy test.

In view of the conclusion reached, it is unnecessary to consider the other grounds of error assigned.

Order affirmed.