**UNITED STATES ex rel. ENGEL v. TOD, Commissioner of Immigration.**

(Circuit Court of Appeals, Second Circuit. December 3, 1923.)

No. 87.

1. Aliens ⬳46—Deaf mute held not "physically incapable of reading" under literacy test statute; "reading."

Under Act Feb. 5, 1917, § 3 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼b), excluding aliens "physically capable of reading," but who cannot read any language, a deaf mute, though physically incapable of reading aloud, is not physically incapable of reading; "reading" being the act practiced or art of perusing written or printed matter and considering its contents or meaning.

2. Aliens ⬳46—Literacy test in "Yiddish" of alien claiming to be able to read "Hebrew" held not fair examination.

Where an alien, who claimed to be able to read "Hebrew," was examined as to his ability to read Yiddish, he was not given a fair hearing, to determine whether he was within the class excluded under Act Feb. 5, 1917, § 3 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼b), providing for a literacy test; "Yiddish" being a Middle High German dialect, or number of dialects, spoken by Jews, containing a large number of Germanized Hebrew words, and using Hebrew characters for its literature.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Yiddish.]

---

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**3. Aliens ☞54—Finding that alien likely to become public charge held not warranted.**

Where evidence in exclusion proceedings showed that the alien, though a deaf mute, was able to support himself as journeyman tailor; and that a brother and an uncle, who were both prosperous business men, were willing to take care of him and put his 16 year old son through college, a finding that he was likely to become a public charge was not warranted.

**4. Aliens ☞46—Assisted alien not excluded, unless shown to belong to one of the excluded classes.**

Under Act Feb. 5, 1917, § 3 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼b), providing for the exclusion of aliens whose passage has been paid by others, it is immaterial that the alien's passage was so paid, unless the alien so assisted is affirmatively shown to belong to one of the excluded classes.

Appeal from the District Court of the United States for the Southern District of New York.

Habeas corpus by the United States, on the relation of Jacob D. Engel, next friend of Hirsch B. Wanderman, against Robert E. Tod, Commissioner of Immigration. From an order dismissing the writ, and remanding the alien to the custody of the Commissioner of Immigration at the port of New York for deportation, relator appeals. Reversed and remanded, with directions.

Emil N. Baar, of New York City (Ary Horwitz, of New York City, on the brief), for appellant.

William Hayward, U. S. Atty., of New York City (James C. Thomas, Asst. U. S. Atty., of New York City, of counsel), for appellee.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

ROGERS, Circuit Judge. This is an appeal from an order dismissing a writ of habeas corpus and remanding the alien to the custody of the Commissioner of Immigration at the port of New York for deportation. It appears that Hirsch B. Wanderman is an alien and a native of Stanislawo, East Galicia, now a part of Poland. He arrived in the United States on the President Harding on February 25, 1923. On his arrival at Ellis Island, New York, he was given a hearing before a board of special inquiry held on March 1st and March 3d, and was excluded. He was excluded on the ground that he was unable to read, was physically defective, was likely to become a public charge, and was an assisted alien. It appears that the alien was informed of his right to appeal to the Secretary of Labor at Washington.

The proofs and record of the proceedings before the board of special inquiry were transmitted to the Second Assistant Secretary of Labor, who, after considering the evidence presented in the record, affirmed the excluding decision of the board and directed the alien's deportation. Thereupon Jacob Engel, a citizen of the United States residing in the city of New York, a brother of the excluded alien, sued out a writ of habeas corpus, requiring the respondent, the Commissioner of Immigration at Ellis Island, to produce the excluded alien in the District Court for the Southern District of New York, to the end that inquiry might be made and that the court might determine the facts and the legality of the detention. The return to the writ having

been duly made, and the case having been heard in the District Court, an order was made on May 15, 1923, which dismissed the writ and remanded the alien to the custody of the Commissioner. From this order, dismissing the writ and remanding the alien, an appeal was taken to this court, which must now be determined.

[1] The Act of February 5, 1917, regulating the immigration of aliens (section 3, c. 29, 39 Stat. 877 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼b]), provides as follows:

"That after three months from the passage of this act [February 5, 1917], in addition to the aliens who are by law now excluded from admission into the United States, the following persons shall also be excluded from admission thereto, to wit:

"All aliens over sixteen years of age, physically capable of reading, who cannot read the English language, or some other language or dialect, including Hebrew or Yiddish: Provided, that any admissible alien, or any alien heretofore or hereafter legally admitted, or any citizen of the United States, may bring in or send for his father or grandfather over fifty-five years of age, his wife, his mother, his grandmother, or his unmarried or widowed daughter, if otherwise admissible, whether such relative can read or not; and such relative shall be permitted to enter. * * *"

It appears that the excluded alien is a deaf mute, and it is argued that the literacy test does not apply in his case on the ground that deaf mutes are not "physically capable of reading." This view of the statute does not commend itself to us. A man who is a deaf mute, it is true, is physically incapable of reading *aloud*; but he is not physically incapable of reading. The New Standard Dictionary defines the word "reading" as follows:

"1. The act, practice, or art of perusing written or printed matter and ascertaining or considering its contents or meaning."

If this alien was capable of perusing the Hebrew language and ascertaining its meaning, he could read and meet the test which the statute prescribed, although physically unable to read aloud. The alien was asked through an interpreter whether he was able to read in any language. His answer was: "Only to read my prayers in Hebrew." This was a somewhat ambiguous answer. If able to read his prayers in Hebrew, he must be capable of reading the Hebrew language, unless he was taught simply to read his prayers in that language in order to pass the literacy test. But the immigration officials did not undertake to find out whether he could read the Hebrew language, or even his prayers in Hebrew What was done was to give him tests in reading the Yiddish language, as is shown by the following excerpt from his testimony:

"Alien given tests as follows: Interpreter wrote on a sheet of paper the following requests, prefixed with the statement, 'Do what you are directed to,' in his native language (Yiddish): 'Go and get your hat and put it on your head.' 'Go back to your seat and come back to the desk here.' (Alien does neither after scrutinizing the sentences thoroughly as written by the interpreter.)"

[2] There was attached to the return to the writ of habeas corpus the report made to the Commissioner General of Immigration at Washington by the Commissioner of Immigration at Ellis Island. It states

that "he [the excluded alien] claims he is able to read his prayers in Hebrew, but he has been unable to pass the required reading test." It appears, however, that he was given no test of his ability to read Hebrew. The test given him was, as we have already stated, in the Yiddish language, which is an altogether different language. The new Standard Dictionary defines the Yiddish as:

"A Middle High German dialect, or number of dialects, spoken by the Jews, containing a large number of Germanized Hebrew words and using Hebrew characters for its literature. It contains about 70 per cent. of German, 20 per cent. of Hebrew, and 10 per cent. of Slavic words, and is used as a polygot jargon for intercommunication by Jews from different nations."

It is evident that a person might be able to read Hebrew and wholly unable to read Yiddish. The alien in the case now under consideration did not claim that he could read Yiddish, but did claim that he could read to some extent at least Hebrew. The test to be given him should therefore have been a test to determine his ability to read the latter language. If he had a reading knowledge of that language, it was wholly immaterial whether he had a reading knowledge of Yiddish. See United States ex rel. Waldman v. Tod (C. C. A.) 289 Fed. 761. An alien seeking admission into the United States is entitled to a fair hearing by the immigration officials to determine whether he is within the class of aliens to be excluded under the law. We do not think that the examination to which this alien was subjected tested his ability to read the only language of which he claimed to have a reading knowledge.

[3] But this alien was excluded, not alone on the ground that he was unable to read. It was also found that he was likely to become a public charge. We find no evidence in the record to support that finding. He was asked, "Particularly in view of your total deafness, how do you expect to be able to do anything toward earning your own support?" To this he replied, "By working as ladies' tailor." The evidence shows that before coming to this country he had worked as a journeyman tailor together with his son, a boy of 16 years of age, and that their joint earnings had been sufficient for their support. The alien's brother had been in the United States for 23 years. He was a naturalized citizen of the United States and was a manufacturer of children's dresses. He had $8,000 invested in his business and an income of $100 a week. He owned a property worth $60,000 in which his equity amounted to $20,000. This property he described as a "16-family house" and the income from that house brought in $10,000 a year. In addition he had, as administrator of his deceased wife's estate, $5,665.

The alien also had an uncle, who was a manufacturer of dresses and a citizen of Brooklyn, and had been in the United States for 19 years. He testified that he had $9,000 invested in his business, and that he also had invited the alien to come to the United States. He was asked, "What is he [the alien] to do here to maintain himself?" and he replied:

"We are to take care of him. * * * We want at least the only part of our family here. That is all we have left of our entire family. We want to put the boy through a commercial course in college."

The alien had come to the United States upon the invitation of his brother. The brother was asked, "What can and will you do for them [the alien and his son, who was 16 years of age] if admitted?" To this he replied, "The son I will put in school, and my brother I will keep at the house."

[4] It was assigned as a further reason for this alien's exclusion that he was an "assisted alien." The provision as to assisted immigrants is found in section 3 of the act of 1917. In naming the persons to be excluded it specifies:

"Persons whose tickets or passage is paid for with the money of another, or who are assisted by others to come, unless it is affirmatively and satisfactorily shown that such persons do not belong to one of the foregoing excluded classes."

The record discloses that the alien's passage money was paid for him. But this is under the statute an immaterial fact, unless the person so assisted is affirmatively shown to belong to one of the excluded classes. Upon this record that has not been satisfactorily shown. Upon the facts in this record the right of the immigration officials to exclude this alien depends upon whether he is unable to read Hebrew. He is entitled, if he so desires, to be re-examined with a view of ascertaining whether he can read understandingly that language. If it is found after a fair test that he can read that language understandingly, no ground appears for his exclusion, and he ought to be discharged from custody.

The order is reversed, and the case remanded to the District Court with directions to proceed in accordance with this opinion.