## UNITED STATES ex rel. AZIZIAN et al. v. CURRAN, Commissioner, etc.

(Circuit Court of Appeals, Second Circuit.
May 21, 1926.)

No. 343.

**1. Aliens ⬤⟳54(17).**

Finding of board of inquiry that alien was illiterate is binding on Circuit Court of Appeals, if reasonably supported by evidence.

**2. Aliens ⬤⟳54(9)—Evidence that alien Armenian could not read card printed in Armenian held sufficient to support finding of illiteracy (Act Feb. 5, 1917, § 3 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼b]).**

Evidence that alien Armenian was unable to read a card printed in Armenian, as required by Act Feb. 5, 1917, § 3 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼b), held sufficient to support finding that alien was illiterate.

**3. Aliens ⬤⟳46—Law authorizing admissible alien to bring in mother, notwithstanding illiteracy, does not permit alien girl 9 years of age to bring in illiterate mother (Act Feb. 5, 1917, § 3 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼b]).**

Act Feb. 5, 1917, § 3 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼b), authorizing an admissible alien to bring in mother, notwithstanding illiteracy, does not permit bringing in of illiterate mother by alien girl 9 years of age.

**4. Aliens ⬤⟳46.**

Alien Armenian *held* not so much a victim of religious persecution as would authorize admission, notwithstanding illiteracy.

**5. Aliens ⬤⟳54(9).**

Holding that Marseilles, France, where alien had lived for two years before seeking admission, was last permanent residence *held* warranted.

**6. Aliens ⬤⟳54(7)—In order to avoid exclusion of alien child, who was an assisted immigrant, it must be affirmatively shown child was not likely to become a public charge.**

Where alien child was an assisted immigrant, it is necessary, in order to avoid exclusion, that it be affirmatively and satisfactorily shown that child was not likely to become a public charge.

**7. Aliens ⬤⟳54(9)—Evidence held not to show that Labor Department erred in finding it was not satisfactorily shown that alien child was not likely to become public charge.**

Evidence *held* not to show that Labor Department erred in matter of law in finding that it had not been affirmatively and satisfactorily shown that alien child was not likely to become a public charge.

Mack, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Southern District of New York.

Habeas corpus by the United States, on the relation of Gulizar Azizian and another, against Henry H. Curran, as Commissioner, etc. From an order denying the writ, relators appeal. Affirmed.

Relators are a mother and daughter, aged respectively 45 and 9, of the Armenian race, and natives of the northern portion of Persia known as Urmia. They possess proper passports and are within the quota allotted to "other Asia."

The mother is a widow, her husband and the father of her child having been killed during the disorders of 1917, when the land of relators' birth was harried by incursions of tribes or peoples not identified in this record; but, whoever they were, they slew many Armenians, including the relator's husband.

She deposed that she was driven out of Urmia and went to "Bacuba, a desert in Bagdad," where she and her child remained for three years; "the English were feeding us," as she stated. Thence she went to Constantinople and to Athens, and from one of these places (it is not clear which) she came to the United States in July, 1922, but was refused admission on account of a disease with which the child was afflicted. She then went to Marseilles, France, where she stayed upwards of two years, sending the child to school. The child recovered and is apparently now in good health.

In September, 1925, relators again attempted to enter the United States. The proper officials of the Department of Labor held that the mother was an illiterate, and was not entitled to exemption under the section of the statute regarding religious persecution, that the daughter was a person likely to become a public charge on account of her tender years, and that both were assisted aliens within the meaning of the law, in that the whole cost of bringing them to this country had been borne by a brother of the elder alien. This man admitted in substance that not only was this charge true, but that he had supported his sister and her child abroad, at least in part.

This writ of habeas corpus having been dismissed, relators took this appeal.

Vahan H. Kalenderian, of New York City, for appellants.

Emory R. Buckner, U. S. Atty., and Nathan R. Margold, Asst. U. S. Atty., both of New York City, for appellee.

Before HOUGH, MANTON, and MACK, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). [1] If there were evidence from which a reasonable Board of Inquiry could have found the elder alien illiterate, we would be bound by the finding; and not only does this record show such evidence, but it demonstrates complete ignorance of the art of reading.

[2] She was tried twice, first with a card of printed Armenian, as required by section 3 of Act Feb. 5, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼b), and second with a primer produced by herself; and admitted herself a failure. There was no obligation on the department to give relator more than one trial, and criticism of her second effort is irrelevant. We think the words used on the Armenian cards were (as far as can be judged from their English equivalents) in ordinary use. U. S. ex rel. Friedman v. Tod, 296 F. 888. They were verses 13–15 of the seventh Psalm, and we think simple in style.

The third section of the act provides two methods of entry, notwithstanding illiteracy, and the mother claims to avail herself of both. The first method depends on these words, viz.: "Any admissible alien * * * may *bring in* * * * his mother * * * if otherwise admissible, whether such [mother] can read or not"; and it is argued that the healthy child of nine is an admissible alien, and may *"bring in"* her mother.

[3] Whether the girl is admissible or not will be examined later; but, assuming that she is, it is a wrenching of language from all ordinary sense to hold that the statute covers such a case as this. If a girl of nine *"brings in"* to this country the mother who cares for her, the same may be said for an infant in arms. Such a construction is absurd; the statute implies a *"bringing in,"* if not by one with authority, at least by one who *causes* the act of bringing.

The second ground of avoiding exclusion as illiterate is that the statute exempts "all aliens who shall prove to the satisfaction of [the Department of Labor] that they are seeking admission to the United States to avoid religious persecution in the country of their last permanent residence.

[4] We fail to discover in this record any evidence of *religious* persecution, and while common knowledge enables us to recognize in this most unfortunate woman a victim of what are too well known as "Armenian massacres," neither evidence nor common report enables us to say that what happened in Urmia in 1917 was a *religious* persecution, as distinguished from robbery and banditry at a time and in a place of social dissolution, if not political revolution.

Indeed, the relator did not claim, when first examined, that she sought admission to "avoid religious persecution"; it is quite evident that the very halting suggestion thereof was an afterthought, subsequent to consultation with relatives already here and with counsel. In this regard the case is substantially identical with United States ex rel. Ghersin v. Commissioner (C. C. A.) 288 F. 756.

[5] There is no suggestion of persecution of any kind in France, where she abode for upwards of two years, and whence she came to the United States, and we are quite unable to perceive error of law in the holding that Marseilles was her last "permanent residence." Indeed, any other holding would mean that one ejected from a residence by religious persecution could for the balance of life reside as long as desired in any number of countries, and still find entry into the United States because once religiously persecuted.

Result is that the order of exclusion against the mother must be sustained.

That both relators were, in the language of section 3 of the statute, "persons whose tickets or passage is paid for with the money of another," is admitted; the only doubt is whether the payment was made by a brother (as he says) or a brother-in-law, as the mother says. This finding affects the child, for she was excluded as "likely to become a public charge." This finding was necessarily based on the condition this girl of nine would be in, if the mother were deported.

[6] But, the child being admittedly an assisted immigrant, it is necessary under the statute, to avoid exclusion, that it be "affirmatively and satisfactorily shown that such persons do not belong to one of the foregoing excluded classes"; i. e., in this instance, that it be so shown that she is *not* likely to become a public charge. The evidence on this point amounted to no more than that she had relatives (uncles) in this country who would take care of her. It is not pretended that any legal obligation lay upon them or any of them so to do, and their resources for so doing seem to us, and evidently seemed to the Board of Inquiry, meager to say the least.

[7] But the legal point is that we cannot say that the Department erred in matter of law in finding that it had not been "affirmatively and satisfactorily shown" that the child was

not likely to become a public charge. In this respect our ruling in United States ex rel. Engel v. Tod, 294 F. 820, needs correction, for we there said that the payment of passage money for an alien was "under the statute an immaterial fact, unless the person so assisted is affirmatively shown to belong to one of the excluded classes." This was inadvertent; the statute plainly requires it to be affirmatively shown that the alien does not belong to one of the excluded classes enumerated before the statement of the exception.

The facts forbid us to find error of law, and there our power ends; but we cannot forego the hope that, since this very scanty record seems to us to show an affectionate, industrious, and diligent family connection already in this country, and health and strength in those now seeking admission under most painful circumstances, a way may be found under section 21 of the statute, (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼kk) to admit the child under bond; we believe the mother will learn to read, and again knock at the door.

Order affirmed.

MACK, Circuit Judge (dissenting). Inasmuch as responsible relatives, though not legally thereunto obligated, are entirely able, ready, and willing to care for the child, I believe that there is no legal basis for a finding by the immigration authorities that she has not sustained the burden of establishing that she is not "likely to become a public charge."