# Illiterate Aliens Seeking Admission as Immigrants

Illiterate aliens who would otherwise be eligible for admission to this country on visas allocated under 8 U.S.C. §§ 1152 or 1153, may not avoid the literacy requirement of 8 U.S.C. § 1182(a)(25) simply by virtue of their being accompanied by a child who is under the age of 16, if that child's own eligibility for admission depends upon that of his or her parents. The State Department's longstanding administrative practice in this regard finds no support in the legislative history of the literacy requirement, which establishes that Congress intended to exempt from its application only those illiterates whose close relatives were independently entitled to be admitted.

December 2, 1981

## MEMORANDUM OPINION FOR THE GENERAL COUNSEL, IMMIGRATION AND NATURALIZATION SERVICE

This responds to your request for assistance in resolving a conflict between the Department of State and the Immigration and Naturalization Service (INS) involving the provision of the Immigration and Nationality Act (Act) excluding illiterate aliens, Act, § 212(a)(25), 8 U.S.C. § 1182(a)(25),[1] and the exception to that section. Act, § 212(b), 8 U.S.C. § 1182(b).[2] You have asked whether an illiterate alien who is attempting to enter the country on a visa allocated under 8 U.S.C. §§ 1152 and 1153 ("quota visa") is eligible for a waiver of the literacy requirement if he is accompanied by a son or daughter who is under the age of 16.[3] The argument, as articulated by the State Department, is

---

[1] This section states:

> (a) Except as otherwise provided in this [Act], the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States: . . . (25) Aliens . . . over sixteen years of age, physically capable of reading, who cannot read and understand some language or dialect.

8 U.S.C. § 1182(a)(25).

[2] The exception reads:

> The provisions of paragraph (25) of subsection (a) . . . shall not be applicable to any alien who (1) is the parent, grandparent, spouse, daughter, or son of an admissible alien, . . . if accompanying such admissible alien, or coming to join such citizen or alien lawfully admitted, and if otherwise admissible. . . .

8 U.S.C. § 1182(b).

[3] This question was apparently triggered by a request from within INS for an advisory opinion on the issue. Memorandum for Associate Commissioner Wack from Deputy General Counsel Schmidt, January 17, 1979. The State Department thereafter submitted a comprehensive memorandum outlining its views. Memorandum for Deputy General Counsel Schmidt from Cecil H. Brathwaite, Acting Chief, Advisory Opinions Section, Visa Services Directorate, December 12, 1980 (Brathwaite Memorandum). INS prepared a further response, Memorandum for Deputy General Counsel Schmidt from Staff Attorney Masterson, July 14, 1981 (Masterson Memorandum), on which the State Department, at the invitation of this Office, submitted comments. Memorandum for Assistant Attorney General Olson from Cecil H. Brathwaite, Chief, Advisory Opinions Section, Visa Services Directorate, September 30, 1981 (State Memorandum).

as follows: The illiterate alien receives a preference number because of his status—for example, as the brother of a United States citizen, 8 U.S.C. § 1153(a)(5)—while his admissibility is determined under 8 U.S.C. § 1182. His child, who will receive a visa because of his parent's quota visa, 8 U.S.C. § 1153(a)(8), is an "admissible alien" under 8 U.S.C. § 1153(b) since he is not barred by any of the conditions in 8 U.S.C. § 1182(a)(1)-(33). Simultaneously, therefore, the illiterate alien becomes "the parent . . . of an admissible alien" who is "accompanying such admissible alien" as provided for in 8 U.S.C. § 1182(b)(1), and his illiteracy may be ignored, while the child becomes entitled to a visa based on his parent's eligibility for a quota visa. This position is set out in the Foreign Affairs Manual, although the example used there involves a husband and wife.[4]

We believe that this position is incorrect and that the illiterate alien is not eligible for such a waiver.

## I. Background

The State Department, through its consular offices overseas, has primary responsibility for issuing visas to those who wish to enter the United States as immigrants. 8 U.S.C. § 1201. For over 2 decades, these consular offices have relied on the position outlined above and have issued quota visas to illiterate aliens as long as they were accompanied by a child under 16, or a literate spouse.[5] Brathwaite Memorandum, at

---

[4] Benefit of section 212(b) in certain cases.

The finding of ineligibility of an alien under section 212(a) (25) of the Act has no bearing on entitlement to an approved preference status. An alien on whose behalf a relative petition has been filed, but who has been found ineligible under 212(a)(25), becomes eligible for the benefits of section 212(b) by virtue of marriage to a literate person who is not otherwise ineligible for a visa The literate spouse from whom this eligibility derives is simultaneously entitled to the preference status of his ineligible spouse and is thereby an "eligible alien" within the meaning of 22 C.F.R. 42.91(25)(i)(d). If visa numbers are available for persons in the approved preference status, the couple may apply for immigrant visas.

9 Foreign Affairs Manual, § 42.91(a)(25) note 3.

[5] One issue, raised by INS, is whether the State Department actually adopted this position in the late 1950s. We have examined the material and believe that the State Department has held this position since at least 1960. In an Operations Memorandum (OM) dated March 25, 1960, sent to the consul in Naples, Italy, the Department approved issuance of a first preference visa to a Mr. Cifrodelli who was accompanied by his wife and children. Since both parents were illiterate, they were "prima facie ineligible to receive immigrant visas " OM, at 2. All the Cifrodelli children were under 16, and were "not stated to be ineligible on any other grounds and therefore may be presumed to be 'admissible aliens' in their own right." Id. "The problem is then resolved into the single question· being admissible aliens, may the illiterate children confer upon their illiterate parents, if accompanying them, the benefits of Section 212(b)(1) of the Act cited? The Department finds that they may do so, that there is nothing in the law which requires a contrary finding. Consequently, Mr. and Mrs. Cifrodelli are to be considered as not ineligible to receive immigrant visas even though they are illiterate aliens." Id.

The June 6, 1980, letter from the State Department to Rep. Walter (then chairman of the House Judiciary Committee's Subcommittee on Immigration and Naturalization) addressed another point— the issue of whether an illiterate alien like Mr. Cifrodelli could be eligible at all for a first preference visa, which was supposed to be reserved for highly skilled individuals. The letter confirmed that the OM cited above "was correct insofar as the technical matters are concerned, which were the sole subject of the advisory opinion . [T]he question put to the Department related exclusively to the aliens' eligibility to receive visas in view of their illiteracy." June 6 letter, at 4.

Continued

10–12. Moreover, the State Department believes that INS has concurred with this interpretation during this entire period. *Id.* INS denies that it ever agreed with this argument and has taken the position that permitting the child to confer eligibility on the parent is a bootstrap construction of the statute that violates congressional intent. Masterson Memorandum, at 11–14. Because of this dispute, the State Department has suspended the issuance of quota visas to applicants whose exemption under § 1182(b) is based on an accompanying child or spouse.

We have carefully reviewed all the memoranda submitted. We recognize that the State Department has acted in good faith on its interpretation for a number of years. Because we are reluctant to overturn decades of administrative practice,[6] we have made an exhaustive canvass of the literacy provision's legislative history in an effort to find support for the State Department's interpretation. We have also examined the scanty case law on this issue.[7] Because of our findings, we are forced to conclude that the State Department's interpretation is inaccurate and that the INS' position is correct.

## II. Legislative History

The literacy provision has a long history. Although it did not become law until 1917, it had been the subject of fierce debate for over 20 years. Three times Congress enacted immigration bills containing a literacy test—1897, 1913, and 1915—only to have them vetoed in turn by Presidents Cleveland,[8] Taft,[9] and Wilson.[10] By that time, it was fair

---

Further, in a June 22, 1960, letter from the State Department to INS, the Director of the Visa Office stated that the Cifrodelli case had raised the problem of whether "one alien can confer a certain status on another alien from whom he in turn must derive a benefit under the immigration laws in order to apply for and receive a visa." June 22 letter, at 1. The letter said that the issue had been resolved by a reference to two prior cases in which visas were issued simultaneously in order to confer cross-eligibility under other provisions of the Act.

There is no doubt, therefore, that the State Department has held its position for a number of years.

[6] A second issue raised by the State Department is whether INS has concurred in this interpretation. On July 3, 1957, INS wrote to the State Department and said: "It is the view of the Service that an illiterate parent can benefit from the provisions of Section 212(b) regardless of the age of the accompanying child and provided, of course, that the accompanying child is fully admissible." We believe that the letter addresses another issue, and that the reference to the fact that the child must be "fully admissible" is too ambiguous to be interpreted in support of either position.

INS inspectors at the border apparently rely on the investigations conducted by the consular office issuing the quota visa and do not usually act to confirm the immigrant's *bona fides,* unless there is some obvious problem Conversation with Deputy General Counsel Schmidt, November 20, 1981. This has apparently allowed the problem to go unnoticed for a number of years, despite the fact that both immigration and consular officers are authorized to conduct the literacy test. 8 U.S.C. § 1182(b).

[7] *See United States ex rel. Azizian* v *Curran,* 12 F.2d 502, (2d Cir. 1926); *United States ex rel. Barone* v. *Curran,* 7 F 2d 302 (2d Cir. 1925); *In re F–,* 2 I. & N. Dec. 260 (1945) *See also United States ex rel. Engel* v. *Tod,* 294 F. 820 (2d Cir. 1923); *In re Gaglioti,* 14 I. & N. Dec. 677 (1974); *In re Khan,* 14 I & N. Dec. 122, *aff'd, sub nom. Santiago* v *INS,* 526. F.2d 488 (9th Cir. 1975), *cert. denied,* 425 U.S 971 (1976).

[8] 29 Cong. Rec. 2667 (1897)

[9] S. Doc. No. 1087, 62d Cong. 3d Sess. (1913)

[10] H. Doc. No. 1527 (1915), *reprinted at* 52 Cong. Rec. 2481 (1915). The literacy test was also considered in 1898, 1902, and 1913, *see* 52 Cong. Rec. 3014 (1915), but did not pass both Houses in those years.

to describe the literacy test as "the bitterest bone of contention in the bill." 53 Cong. Rec. 4869 (1916) (statement of Rep. Mann). The fourth attempt to override the veto of a restrictive immigration law occurred in 1917 when President Wilson again vetoed the bill. H. Doc. No. 2003 (1917), *reprinted at* 54 Cong. Rec. 2212-13 (1917). That year, however, the supporters of restrictive immigration had sufficient votes to override the veto, and the bill became law.

Tracing the literacy test over the years, it is clear that it was an expression of strong anti-immigrant sentiment. It was specifically designed to curtail the flow of immigrants from southern Europe and Russia, whose background was felt to be incompatible with American institutions. Since these were also the groups with the highest rate of illiteracy, it was felt that the quickest and most efficient way to stem the flow was through a literacy test. Although opponents argued that it was discriminatory, not a fair test of character, and a repudiation of American ideals, its supporters retorted that diminishing resources necessitated a more limited admissions policy. In view of the clear statements by the bill's proponents that they wanted this provision in order to exclude as many aliens as possible, we do not believe, as the State Department does, Brathwaite Memorandum, at 9, that there is any evidence of a congressional desire to have the provision's exception interpreted liberally.

When first considered by the House in 1896, the exclusion provision contained an exemption only for parents of admitted aliens.[11] "The reason for the exemption of parents whose children have preceded them hither is obvious, and this provision requires no explanation further than that it was prompted by humane considerations." H.R. Rep. No. 1079, 54th Cong., 1st Sess. 2 (1896).[12] This humanitarian concern was repeated in 1912, when the provision was again considered.[13] "[P]ractically the identical bill" was passed again in 1915, and vetoed by President Wilson. 52 Cong. Rec. 50 (statement of Sen. Smith). *See supra* n.10. Finally, in 1917, Congress, after weeks of vitriolic debate[14] and over President Wilson's second veto, passed a law excluding illiterate aliens. Act of February 5, 1917, § 3, 39 Stat. 874, 877 (1917).[15]

---

[11] "But no parent of a person now living m, or hereafter admitted to, this country shall be excluded because of his inability to read and write." 28 Cong. Rec 5417 (1896).

[12] The Senate expanded the exception to cover grandparents, 29 Cong. Rec. 46 (1896); *id.* at 1423 (1897), and it was ultimately amended to cover wives and minor children. *Id.* at 2667 (1897).

[13] "Out of regard for marital and other close family ties, and the duties and obligations arising therefrom, as well as high moral considerations, the committee thought proper to make the other exceptions embraced in the bill." H.R. Rep. No. 851, 62d Cong., 2d Sess. 2 (1912)

[14] *See, e.g.,* 54 Cong. Rec. 2442-57 (1917); *id.* at 2465-63, 2620-29; 53 Cong. Rec. 4768–4816 (1916); *id.* at 4841–4885, 4932–4962, 5050–52.

[15] All aliens over sixteen years of age, physically capable of reading, who can not read the English language, or some other language or dialect, including Hebrew or Yiddish: *Provided,* (1) That any admissible alien, or any alien heretofore or hereafter legally admitted, or any citizen of the United States, may bring in or send for his father or grandfather over fifty-five years of age, his wife, his mother, his grandmother, or his unmarried or widowed daughter, if otherwise admissible, whether

Continued

This law remained in force until 1952, when it was replaced by the present provision.[16] The 1952 Act was preceded by a three-year study commissioned by the Senate which recommended that the literacy provision be retained but that all exemptions for relatives be deleted. S. Rep. No. 1515, 81st Cong., 2d Sess. 375 (1950). Although the original House and Senate versions accepted this recommendation, H.R. Rep. No. 2096, 82d Cong., 2d Sess. 24 (1952), and an effort to introduce an amendment on the floor of the House was defeated, 98 Cong. Rec. 4432 (1952),[17] the final Senate version, which contained the exemptions, was accepted by the House and Senate conferees. H.R. Rep. No. 2096, *supra* at 128.[18] Minimal attention was paid to this provision because of its reduced importance as an exclusionary device.[19] The Senate report, however, refers to illiteracy as one of the "more important grounds" for exclusion, S. Rep. No. 1137, 82d Cong., 2d Sess. 8 (1952), and noted that the clause was being revised to require understanding of, as well as reading of, a language. *Id.* at 10. There is nothing to indicate that Congress meant its recodification to result in a more liberal interpretation of the section.

## III. Discussion

Illiterate aliens are one of the groups "ineligible to receive visas," 8 U.S.C. § 1182(a).[20] The exception to this rule operates if the illiterate alien is "accompanying . . . [an] admissible alien." 8 U.S.C. § 1182(b). Even if we were to decide that admissibility is an issue wholly governed by § 1182 and not dependent on whether one is eligible for a quota visa under § 1153 (an issue we do not resolve), we do not believe that the State Department's argument that the child of an illiterate alien is "admissible" under § 1182 is correct. Under § 1182(a)(20), an alien is

such relative can read or not; and such relative shall be permitted to enter. One of the few cases interpreting this provision emphasized that the principal alien had to be capable of "bring[ing] in" the parent, and rejected the claim that a 9-year-old girl could "bring in" her mother. *United States ex rel. Azizian* v. *Curran,* 12 F.2d 502, 503 (2d Cir. 1926)

[16] *See* nn. 1 & 2.

[17] *See also* 98 Cong. Rec. 4435–36 (1952) (statement of Rep. Powell).

[18] It is possible that the exemptions were reintroduced at the urging of the INS. Internal Justice Department memoranda commenting on the proposed bills criticized them because they "seem to create an anomalous situation. In § 203(a) (2), (3), and (4), preferences are created in the quota for parents, children, and certain other close relatives. These preferences will apparently avail them nothing if it should appear that they are illiterate. It is recommended that the attention of the Congress be invited to this situation so that, if desired, the bill can be changed to provide an exemption for close relatives, similar to that which exists in the present law." Memorandum for the Deputy Attorney General from the Commissioner of Immigration and Naturalization, December 7, 1951, (56190/113–A) (Part II), at 212–18 *See also* Memorandum for the Deputy Attorney General from the Commissioner of Immigration and Naturalization, January 16, 1951, (56190/113–A) (Part II), at 25. Both of these can be found in the main library of the Department of Justice, in vol. 1 of the bound legislative history of the 1952 Act.

[19] The December 7, 1951 memorandum discussed *supra* n.18 indicated that fewer than 2,000 illiterate aliens a year were then applying for admission.

[20] Although the State Department bases its argument in large part on the distinction between eligibility for a quota visa under § 1153 and admissibility under § 1182, Brathwaite Memorandum at 3–4, an illiterate alien is entitled to neither a visa nor admission under § 1182 unless he is exempted by § 1182(b).

371

inadmissible unless he is "in possession of a valid unexpired immigrant visa." *See also* 8 U.S.C. § 1181(a), § 1182(a)(21). The child cannot possess a valid immigrant visa until he confers eligibility upon his parent who thereupon becomes eligible for the quota visa, and thus obtains one for the child. The circularity of this reasoning can be avoided if the statute's intent is remembered. The § 1182(b) exception was intended as a humanitarian exception to permit immigrants to bring their close—but illiterate—family members to this country. It was not intended to permit illiterates to enter by bringing their children with them. It is difficult to imagine that Congresses uniformly hostile to the admission of illiterates intended to create an exception for illiterates with families.

Rather, the statute should be read to permit literate aliens to receive a quota visa and then to use the exception to bring in their illiterate children and close relatives. This comports with both of Congress' desires: to exclude illiterates and to provide a humanitarian exception minimizing disruption of a qualified alien's family.[21] We therefore conclude that the INS is correct in asserting that illiterates are not eligible to receive quota visas because they will be accompanied by a child who is under 16. We assume that the State Department will so advise its consular officers and will revise its regulations based on this understanding.

LARRY L. SIMMS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[21] The State Department is no doubt correct when it asserts that this interpretation will bar most illiterates from receiving quota visas. State Memorandum, *supra* at 4 That, we believe, was Congress' intention.