### UNITED STATES ex rel. BOXER v. TOD, Com'r of Immigration.

(Circuit Court of Appeals, Second Circuit. November 5, 1923.)

#### No. 31.

1. Aliens ☞54—No exclusion on ground of illiteracy unless record discloses class.

Before applicant for admission to the United States can be excluded on the ground of his illiteracy, the record must disclose that he was within the class to which that test is applicable under Immigration Act, § 3 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼b).

2. Habeas corpus ☞92(1)—Reason for coming to United States question of fact not determined in habeas corpus.

Whether or not alien had come to the United States to escape religious prosecution was a question of fact, and, like other questions of fact, was for the immigration authorities and not for the court in habeas corpus proceeding to obtain a release.

3. Aliens ☞54—Evidence held to sustain finding of immigration authorities.

Evidence on a hearing before immigration authorities held to sustain their finding that alien did not come to the United States to avoid religious persecution so as to be exempted from the illiteracy test under Immigration Act, § 3 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼b).

4. Constitutional law ☞73—Finding of fact by executive department conclusive.

Where jurisdiction exists, a finding of fact by the executive department of the government is conclusive upon the court.

5. Habeas corpus ☞23—Courts powerless to interfere if fair hearing granted alien and finding supported by evidence.

If a fair hearing has been granted an alien applying for admission to the United States and the finding of fact by immigration officials is supported by evidence and no erroneous rule of law has been applied, the court is powerless to interfere in habeas corpus.

Appeal from the District Court of the United States for the Southern District of New York.

Habeas corpus by the United States, on the relation of Joseph Boxer, next friend of David Koch, against Robert E. Tod, Commissioner of Immigration of the Port of New York. From an order sustaining the writ, respondent appeals. Order reversed, with directions to enter order remanding relator.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

William Hayward, U. S. Atty., of New York City (James C. Thomas, Asst. U. S. Atty., of New York City, of counsel), for appellant.

Julius Gottlieb, of New York City, for relator.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. This is an appeal from an order made in the District Court on January 12, 1923, which sustained a writ of habeas corpus and directed that David Koch, the relator herein, be immediately released by the immigration authorities at Ellis Island.

It appears that the relator, Koch, is an alien and a citizen of the Republic of Poland. He arrived on the steamship Mauretania at the Port of New York on November 25, 1922. He was granted the usual hearing before a board of special inquiry on November 27, 1922. At that hearing testimony was taken. The following is an excerpt from his testimony:

"Q. What did you do before leaving for the United States? A. Worked as a tailor. Doing cheap tailoring. I was making pants for children; knee pants.

"Q. Are you qualified in any other branches of tailoring? A. No.

"Q. Were you supporting yourself abroad? A. Yes.

"Q. Why did you leave this country in 1914? A. I went to my native town in 1914, for the purpose of selling a house in order to come out to America with my wife and children, and in the meanwhile the war came on and I was prevented from doing so, and in the meantime two of my children and wife died.

"Q. Have you any children in the United States? A. No.

"Q. Have you any resources besides the money with you? A. No."

The relator Boxer was examined. He testified that Koch had married his sister's daughter. The following is an excerpt from Boxer's testimony:

"Q. Did you send for your nephew? A. Yes, to take care of him and see that he does not become a public charge. He was here nine or ten years ago. He worked. I don't know why he left.

"Q. Where is his wife? A. In Europe.

"Q. When did you last receive word from them? A. A few months ago.

"Q. Has he any children in the United States? A. No; three children living in Europe; one married.

"Q. Did you send him money? A. Yes, passage. His sister-in-law Hanna Sundtag. Everybody contributed $50 or $75."

Koch was then asked and answered as follows:

"Q. Does not Mr. Boxer, your deceased wife's uncle, know that your wife and two children have died? A. It happened only three months ago. One died every once in a while."

He was tested as to his ability to read. This he was unable to do— the record revealing the following:

"Tested. Cannot read class 5—1593—Yiddish. Cannot read the same.

"Class 5—3683, Hebrew. Reads some, but does not understand.

"Cannot read."

A medical certificate was introduced and made a part of the record. It certified that the alien had been examined and found to be undersized.

While in his preliminary statement to the board the alien claimed to have paid his own passage, it was brought out during the course of the hearing that his passage was paid for in part by relatives. He arrived with only $2. He had no other resources.

He was excluded from admission into the United States by the board of special inquiry as "unable to read," as a person "likely to become a public charge," and as an "assisted alien."

The board of special inquiry having unanimously voted to exclude him, informed him that he was denied admission, and that he had a right of appeal to the Secretary of Labor and asked whether he wished to appeal. He answered that he did. His appeal to the Secretary of Labor resulted in an affirmance of the order of exclusion. Thereafter he obtained a writ of habeas corpus. The respondent filed a return and the matter came on to be heard in the District Court. There are no minutes of that hearing in the record, no minutes of it having been taken. But the record reveals that the judge ordered that the writ be sustained unless another hearing was granted "upon the question whether David Koch sought admission to this country, fleeing from religious persecution, and that the findings of fact by the commission be returned to me forthwith." Prior to this hearing in the District Court no claim had been put forward and no suggestion made that the alien had come to the United States to escape from religious persecution. But after this order a rehearing took place and the alien was examined at some length.

The following is an excerpt from the testimony given at the second hearing:

"Q. Where did you reside before coming to the United States in November last? A. In the same town (Drohobytz).

"Q. Where were you working? A. In Drohobytz. I was selling dry goods, and I was peddling fruit.

"Q. How long were you doing that? A. From 1917 to 1920 I was selling dry goods, and from 1920 to 1922 I was peddling fruit.

"Q. When did you stop peddling fruit? A. I stopped peddling fruit five months ago, after I was robbed during a pogrom.

"Q. Of what were you robbed during the pogrom? A. Everything movable in the house was robbed, and then the house was put on fire and my wife and my children were killed.

"Q. Who killed your wife and children? A. A robber band.

"Q. Where did this band come from? A. Peasants from the vicinity.

"Q. Did they attack everybody in the town? A. Many people were attacked in the town. One of the bandits threw a bayonet after me, which struck me in the neck and remained there. It was extracted later and then the wound healed. (Exhibits scar at back of neck.)

"Q. Did this band kill your wife and two children? A. First they were assaulted and then they were killed.

"Q. When? A. In September.

"Q. Were other people in the village also killed? A. About 40 or 50 people.

"Q. Of what race were those who were killed? A. Jewish.

"Q. All Jewish? A. Yes.

"Q. Were any Gentile people attacked? A. No.

"Q. When did you write to Mr. Boxer in Brooklyn, N. Y., requesting him to assist you in coming to the United States? A. A day in Tishri (which corresponds to second half of August).

"Q. Then it was your intention to come to the United States before the pogrom took place? A. Not wholly.

"Q. Did you write this Mr. Boxer for money and affidavits? A. Yes.

"Q. Was your purpose in coming to the United States to improve your condition in life, or were you coming here to escape from any religious persecution that you may have suffered? A. I am coming here to improve my economical condition and also to escape a possible recurrence of a pogrom. It is generally believed there that it may happen again under the present circumstances. * * *

"Q. Do you expect your daughter and son-in-law to come to the United States? A. I do not know. * * *

"Q. How many children did you have living with you at Drohobytz? A. Two children.

"Q. Were they boys or girls? A. A boy and a girl.

"Q. How old were they? A. The boy was 25 years and the girl was 21 years.

"Q. When you state that your wife and children were assaulted, what do you mean by that? What was the nature of the assault? A. Rape was committed on the wife and daughter.

"Q. How did the death of your son come about? A. The son was defending them and while resisting them they shot him.

"Q. Previous to the actual outbreak of this disturbance which you say lasted for 36 hours, had you been living there and conducting your business with a sense of security? A. Yes.

"Q. Then what was the reason for your writing to your relative in America to send you money and affidavit as far back as August? A. Business was not very good and I started to eat, ready cash money, and I thought of writing to my relative in America I could come out to America, but in the meanwhile the outbreak came. * * *

"Q. Did you recognize any of the persons which participated in this outrage? A. Yes, I recognized some of them; they were captured and arrested.

"Q. Were any measures taken against the perpetrators by the authorities, and, if so, what kind? A. They are now under arrest, detained for trial.

"Q. Is not your presence necessary as a witness in the case? A. I left my statement in the court and this was recorded. The robbers confessed to the crime. * * *

"Q. Your passport was obtained August 7, 1920, which would indicate that it was your intention at that time to proceed to the United States? A. Yes.

"Q. Why didn't you come to the United States at that time? A. My earning conditions improved and I decided to remain."

It appears that after the second hearing was concluded the board unanimously affirmed its former decision for the reason given at the first hearing.

A supplemental return was then made to Judge Mack on January 12, 1923, the testimony taken at the second hearing being made a part of the supplemental return. On the same day he entered an order directing "that David Koch be released by the authorities at Ellis Island forthwith." And it is from that order that this appeal was taken.

It is urged upon this appeal that the judge was in error in sending the matter back for a further hearing. We do not think so, for a reason now to be stated.

The immigration authorities proposed to exclude this alien for the reasons already stated herein. But the immigration authorities in their examination of the applicant seem to us to have ignored completely the following provision of the act:

"That the following classes of persons shall be exempt from the operation of the illiteracy test, to wit: All aliens who shall prove to the satisfaction of the proper immigration officer or to the Secretary of Labor that they are

seeking admission to the United States to avoid religious persecution in the country of their last permanent residence, whether such persecution be evidenced by overt acts or by laws or governmental regulations that discriminate against the alien or the race to which he belongs because of his religious faith." 39 Stat. c. 29, § 3, p. 877 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼b).

[1] .Before the applicant can be excluded on the ground of his illiteracy, the record should disclose that he was within the class to which that test was applicable. There was nothing in the record which disclosed that fact or upon which the immigration authorities were entitled to form an opinion concerning it.

This case is distinguishable in its facts from United States v. Commissioner of Immigration (C. C. A.) 288 Fed. 756, decided on March 13, 1923. In that case the applicant was not expressly asked whether she had left her country to escape persecution. But she was asked the reason for her coming to the United States. In answering that question she did not mention among the reasons she gave that of desiring to escape religious persecution. She had not a word to say about religious persecution. And all this court decided was that in view of the general inquiry as to her reason for leaving the board was not bound to ask expressly whether she left to escape religious persecution. In the instant case no such general question had been asked, and the board had no information whatever before it upon that subject, and without such information it could not determine whether the applicant was or was not subject to the illiteracy test.

But while upon the facts disclosed upon this record we sustain the right of the judge to send the matter back for a further hearing, we are unable to sustain the order he made directing the immigration officials to discharge the relator from custody. This we think he had no authority to do.

[2, 3] Whether or not the alien had come to the United States to escape religious persecution was a question of fact, and, like other questions of fact, was for the immigration authorities and not for the court. While there was no evidence at the first hearing upon the subject, there was evidence upon it at the second. The weight of that evidence was for the immigration authorities. The fact that after hearing it they adhered to their former ruling shows that they were not impressed by it and in view of the fact that this man had left the United States in 1914 intending to return, but was prevented from doing so by the war, and the further fact that he obtained his passport early in August, 1920, and had it extended in August, 1922, and prior to the awful atrocities which were not committed until September, and also before they had occurred had written to his uncle in this country of his intentions and had asked his assistance, were justified in reaching the conclusion at which they arrived.

We say this although we understand that the decision rested with them and not the court below or this court upon appeal. They were judges of the fact.

The law in this class of cases is now well established, and may be briefly stated as follows:

[4] (1) Where jurisdiction exists a finding of fact by the Executive Department is conclusive. United States v. Ju Toy, 198 U. S. 253, 25 Sup. Ct. 644, 49 L. Ed. 1040.

[5] (2) The courts are powerless to interfere if a fair hearing has been granted. Chin Yow v. United States, 208 U. S. 8, 28 Sup. Ct. 201, 52 L. Ed. 369.

(3) And if the finding of fact is supported by evidence. American School v. McAnnulty, 187 U. S. 94, 23 Sup. Ct. 33, 47 L. Ed. 90.

(4) And if no erroneous rule of law has been applied. Gegiow v. Uhl, 239 U. S. 3, 36 Sup. Ct. 2, 60 L. Ed. 114.

In this case the immigration officials acting for the Executive Department had made a finding of fact, after a fair hearing, which was supported by evidence. And the action taken involved the application of no erroneous rule of law.

Judge Hough heard the argument and at its close concurred with us in the conclusion reached, but because of necessary absence has not seen the opinion as prepared.

The order appealed from is reversed, and the court below is directed to enter an order remanding the relator back to the custody of the Commissioner of Immigration at the Port of New York for deportation in conformity with the law.