## RICE et al. v. UNITED STATES.

Circuit Court of Appeals, Second Circuit.
November 4, 1929.

No. 55.

See, also, 26 F.(2d) 487.

Fred D. Kaplan, of New York City (Leslie Tompkins, and J. W. Friedman, both of New York City, of counsel), for appellant Yorston.

James A. Reed, of Kansas City, Mo., John Wattawa, of Washington, D. C., Max Forst, of New York City, and Daniel F. Cohalan, of New York City, for other appellants.

Charles H. Tuttle, U. S. Atty., of New York City (David W. Peck and Elbridge Gerry, Sp. Asst. U. S. Attys., both of New York City, of counsel), for the United States.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge. The appellants were convicted of violations of the United States Criminal Code. The indictment contained ten counts charging breaches of section 215, United States Criminal Code

(title 18, § 338, United States Code [18 USCA § 338]), and one count a violation of section 37 of the United States Criminal Code (title 18, § 88, United States Code [18 USCA § 88]). Other defendants were named in the indictment. One was acquitted, and the indictment dismissed as to one. The defendants were acquitted, by a directed verdict, of counts 5, 6, 7, and 8. Appellants Rice, Yorston, Idaho Copper Corporation, and Wall Street Iconoclast, Inc., were found guilty of counts 1, 2, 3, 4, 9, 10, and 11. Both individuals were sentenced to prison terms and the corporate appellants were fined.

In February, 1925, the Idaho Copper Corporation owned mine property or mining claims in Idaho, where it was said there were deposits of copper which might be mined with profit. The appellant Yorston became its president, and undertook to sell 1,299,000 shares of preferred stock. He gave an option to purchase these shares to one Werblin, a broker amongst brokers, at 10 cents per share. It was agreed that, if Werblin sold or placed this stock, he was to receive 200,000 shares. Appellant Rice was interviewed, and, after some conferences, on March 14, 1925, contracted for an option to purchase the 1,299,000 shares of preferred stock and 526,500 shares of the directors' stock at the same price. These latter are referred to as the ownership shares. Rice's nominee in the transaction was his brother-in-law, Silva. Rice agreed to pay Werblin a commission of 2 cents on each share taken up by Rice under the agreement. The option ran for three years and Rice was required to take a minimum of 50,000 shares a month, and it was agreed one share of ownership stock should be taken up with one share of preferred stock. Further, it was agreed that all the stock be escrowed for 90 days after the expiration of the option agreement, and if, for any reason, the stock was suspended from trading on the Boston Curb Exchange, the option would be extended. The agreement has the earmarks of an effort to sell stock; little is said about mining copper.

The Wall Street Iconoclast was a publication owned and edited by appellant Rice. He used it, amongst other things, to give misinformation as to the Idaho Copper Corporation stock, and as a medium of advertising to sell the stock which he had under option. A conspiracy, charged in the eleventh count of the indictment and as found by the jury, existed between January 21, 1924, and April 6, 1926, in violation of section 37 of the United States Criminal Code (18 USCA § 88), the scheme of which was to acquire the mining properties and defraud purchasers or prospective purchasers in the sale of the stock by the use of the United States mails. The plan of the conspiracy was to misrepresent as to the property, its value, prospects, and returns. The United States mails were used in furtherance of this scheme to defraud in the instances set forth in other counts on which convictions have been had. These constitute the crimes charged in violation of section 215 of the United States Criminal Code (18 USCA § 338).

It will be necessary to state the further facts at some length for the proper consideration of the numerous assignments of errors argued. Three days after the option contract was signed, March 17, 1925, the Iconoclast began boosting the Idaho Copper Corporation stock. The write-ups featured two reports on the property. The properties are mining claims referred to as South Peacock. One report is dated March 29, 1905, by one Hancock, and the other, dated March 13, 1925, is by the appellant Yorston, as president. These reports in substance extol the prospects and Yorston's particularly estimates the ore body down to the 200-foot level as giving "a net valuation of 22 million dollars as and when mined, milled or smeltered." The reports were used as the basis of articles in the Iconoclast on five separate dates.

When Hancock's report was "published in full," it omitted a paragraph which stated, contrary to the Iconoclast's article, that returns could not be expected from "grass roots" down, as represented by the appellant Rice in the Iconoclast. Yorston had never been inside the mine before "his report" was made and used. It was stated in the Iconoclast that Hancock was an engineer beyond repute. He had been convicted of fraudulent use of the mails in a similar scheme. The appellant Rice employed a Boston Curb Exchange broker to buy and sell the stock for the Iconoclast and himself after the signing of the option contract. By Rice's instructions, three fictitious names were used; as a result of these sales there was remitted to Rice, up until April, 1926, between $3,000,000 and $4,000,000. Rice dictated the price at which stock was to be bought and at which it was to be sold, and became both buyer and seller of the same block of stock in many transactions.

Without disclosing who was doing it on September 23, 1925, the Iconoclast said: "Remarkably enough, manipulation is still absent. A broker representing one of the leading Stock Exchange houses stated to-day that no very active stock market in the his-

tory of Boston had probably shown such freedom from manipulation." The first sales were for 56 cents a share. A reaction set in, whereupon the Iconoclast said on April 21, 1925: "The reaction uncovered many stop-loss orders, and shook out an unwelcome overnight speculative following. Short sellers on the dip, however, have received an unmerciful trimming, and indications are as the days roll by that the trimming will develop into real carnage." These articles were a clear indication that there was little desire to develop the mine, but a stock-selling campaign was on. While this effort to sell stock was on, there was little cash in the treasury.

On April 25, 1925, while the stock was selling at 93 cents, the inspector of mines of Idaho telegraphed to the Boston Curb Exchange, where the stock was listed, that the mine the Idaho Copper Corporation professed to own was involved in two failures; that it had been idle for 24 years; that the underground workings were practically inaccessible; that the advertising matter circulated in the sales stock was grossly misleading and in conflict with the Idaho laws, and there was a request that the Exchange remove the listing and trading in the stock until the company complied with the Idaho laws, and an offer was made to give further information, if asked. The stock was suspended. A suit by the Idaho Copper Corporation, instituted by the Iconoclast against Campbell for libel, resulted from these telegrams. The case was tried, and there was a verdict for Campbell.

In explaining the suspension, the Iconoclast said, on April 28, 1925, that, when the original listing was ordered by the board of governors, the company made an application to list 750,000 in bonds as well as 2,500,000 shares of capital stock, and the application blank named the price at which the bonds and stock would net the treasury; that the bonds were withdrawn and put back into the company's treasury and the financing contract in force abrogated; that the corporation did not notify the Curb Exchange of this and its new financing; that prompt action was being taken, and a new application blank was being forwarded to the Curb Exchange, and the officials of the company believed that reinstatement would follow promptly. Appellant Yorston as president, wrote the Exchange on April 15, 1925, as to these bonds being withdrawn.

A committee of the Boston Curb heard Yorston and others, including the attorney of the Idaho Copper Corporation, in refutation of the Campbell charges. The appellant Yorston declared falsely that Rice had no connection with the Idaho Copper Corporation. On November 14, 1925, the Iconoclast said: "The editor of The Iconoclast is not an official of the company, nor is this newspaper any official or unofficial nor semi-official mouthpiece of or for this company, nor any other company."

Three directors of the corporation resigned in April, 1925, and the reason given was their receiving knowledge that the enterprise was a stock-jobbing scheme, rather than an honest attempt to develop a mine; that the appellant Rice and the Wall Street Iconoclast were connected with the enterprise, and they disapproved of the method of selling stock. They also disapproved the explanation given to the Boston Stock Exchange, and asserted that they did not question the integrity or honest purpose of Campbell in sending his telegram. This did not warn the appellants, if, indeed, they needed warning. Instead, the Iconoclast viciously attacked the directors who resigned, and, on April 28, 1925, while the stock was under suspension as a result of Campbell's telegrams, Yorston, as president, wrote to the Exchange, advising them that it had sold, on behalf of the corporation, treasury stock to Werblin, the broker, for $170,312, and had his note, and that this was now an asset of the corporation, and the stock was held as collateral; further, that the sale was "upon the firm contract without any stipulations or conditions." The evidence given by one of Rice's attorneys, however, established that no such agreement as mentioned in the letter was made, and no notes were executed. Such a sale of stock was incredible, for the appellant Rice had all the treasury stock under option.

The financial statement issued under the signature of Yorston, as president, submitted to the Curb Exchange, showed accounts and notes receivable of $170,312. A continuation of the false representations as to the work at the mine was made in the Iconoclast on April 26, 1925. It was falsely stated that a shaft had been sunk 324 feet, and that the ore had an average thickness of 50 feet; that shallow shafts and open cuts had been sunk at intervals of over a distance of 1,010 feet, and "these workings have all made it apparent that the company has a large developed ore body." At the time no one had entered the mine for years. There was water below the 200-foot level; the shaft was rotten, and could not be used.

On June 26, 1925, appellant Rice, through Silva, entered into another contract whereby he agreed to pay for the stock not

theretofore taken up at the rate of 50 cents a share, 10 cents in cash and 40 cents in Idaho Gold Corporation stock, which was another Rice-owned corporation. In order to secure the execution of this contract, each interested in the corporation secretly contributed free stock bonus to Rice, amounting to 150,000 shares. The stock was relisted on the Boston Curb in July, 1925, apparently on the strength of these false representations. The first sales were at 44 cents a share, and through the Boston broker through whom Rice manipulated the market the stock began to advance in price. The Iconoclast did its share to this end. On July 15, 1925, it announced that the "directors, having recently agreed to finance it on the basis of 50 cents a share for treasury stock, have been anxious that the market, for at least a little while, should maintain a level at or near this price, so that even the smallest stockholder might feel that the same opportunity was afforded him at some time to buy the stock, at or about the same price at which the company agreed to realize some hundreds of thousands of dollars on its entire block of treasury stock." In point of fact, the public could not buy the stock by paying for it with Idaho Gold Corporation stock, as Rice did.

On April 16, 1925, the date on which the conspiracy ended, according to the indictment, the price had risen to $6.25 a share on the Boston Curb. During all this time nothing of a constructive character was being done, nor was any sincere attempt made to work the mine. An engineer, who was paid a small salary, visited the mine in the summer of 1925. He found the mine devoid of equipment; the shaft was so dilapidated as made it impossible to enter. He spent the summer on the ground, and did little toward rehabilitation, because of insufficiency of funds. During this time, the stock had risen on the Exchange to $4.50 a share, and the value of the mine at this stock price was about $10,000,000. But Rice and his associates, speaking through the Iconoclast, continued boosting the property. On September 12, 1925, Yorston, at a private sale, sold to Rice 225,000 shares of his stock at 33⅓ cents a share, the market price at the time being about $3.50. On July 1, 1925, Yorston had written, for publication in the Iconoclast, that he had voluntarily tied up his stock pending the financing of the company, and "I have not the remotest idea to ever realize on it, except as a result of the actual metal the company produces."

The Hancock and Yorston engineering reports had been used continuously. For stock-selling purposes, the defendant Weed was employed on September 22, 1925, as chief engineer of the Idaho Copper Corporation at a salary of $100,000 a year—$50,000 to be paid by Rice and $50,000 by the corporation. Without seeing or entering the mine, he made a very favorable report of its value and prospects, and compared the richness of ore to those ore bodies in the bonanza camps in Arizona. He misrepresented that there was $300,000 in the treasury to work the mine, and promised to devote his entire time to working the mine. His employment and report were made the most of in the succeeding issues of the Iconoclast. It must have been clear to the jury, as it is to us, that Weed's name was used to advance the sale of stock, not to operate the mine. The phrase and substance of this report clearly points to its use, not as an engineer's professional report for mining purposes, but rather for use in the stock-selling scheme. On September 28, 1925, Yorston said the company had $400,000 in cash in the treasury; at the time it had $80,000, in the bank.

In October, 1925, Weed went to the mine and stated to the engineer on the ground: "There is nothing here and never will be. The mine is a lemon." He made this appraisal after visiting the 42 and 100 foot levels. The engineer on the ground went to the 200-foot levels; the conditions were about the same in both. A telegram sent by Weed on November 10, 1925, reported in substance that the mine was as he described to the engineer on the ground—suggested that the way out was to buy the Iron Dyke mine nearby. During September, October, and November, the Iconoclast described Weed's report as finding rich property and "the ore as spectacular." Large estimates were made of its wealth, unnecessary to refer to. The experts, called by the government to examine the mine, found practically no high-grade ore in it. The property consisted of garnet, and did not run one-half to 1 per cent. copper. The operation of the property after April 6, 1926, showed that only 5 tons of ore were taken out during the entire operation, and but 300 or 400 tons were mined, returning only $439, and the expenses were $59,000.

The Iron Dyke was purchased for $100,000, the funds having been obtained by the sale of treasury stock, contrary to the promises made earlier that no corporate funds would be used to purchase properties. When purchased, in December, 1925, the Iron Dyke was still under water and impos-

sible to examine, but the Iconoclast published concerning it, on December 17, 1925, that "the richest and most valuable ore bodies are beginning to show up at the lowest levels heretofore attained"; that the gold and silver values were decidedly increasing with depth; that the holes in the upper workings are pyritic, and "in the lower workings, according to both Dr. Weed and Geologist Thayer Lindsley, the low-grade salytic ore of the upper workings is beginning to give way to higher grade black glance or chalcocite ore, and the iridescent 'Peacock ore' or bornite, the two prevalent rich copper sulphite minerals of Butte and of the Peacock group claims in Seven Devils." A mining engineer, who for six months served at the Iron Dyke in 1927, testified that the material in the mine, and the material that was being mined while he was there, was less than 2 per cent. copper, and that it would have to run 3 or 4 per cent. to be profitable.

As stated, the conspiracy and offenses as charged in the indictment ended April 6, 1926. On that day, arrangements were made for a merger between the Idaho Copper Corporation and the Idaho Copper Company, Limited. The latter company owned the Red Ledge property. The appellants were permitted below to show this transaction as evidence of good faith, and on the claim that its purchase had been previously planned. It was established that an underwriting contract was made between Rice, through his nominee brother-in-law, and the representative of the Idaho Copper Company, Limited, by the terms of which Rice was given an option without obligation to take 1,000,000 shares of Idaho Copper Company, Limited, stock for $1 a share. If the stockholders of the Idaho Copper Corporation did not take it up pursuant to this privilege, for every share taken up Rice received 1⅞ shares as a bonus. Stockholders took up 778,000 shares at $1 a share; Rice, 222,000 shares, at $1 a share; and he received 1,700,000 shares, making the cost of 1,922,000 shares. It later sold on the market for $6 a share. Rice, by the contract, became the company's financial agent, and he named four of the seven directors. The Iconoclast, on February 18, 1926, made a statement describing the ore bodies and expected tonnage, future profits, and promises of the engineers. Later a receiver was appointed for it, and the stock sold as low as 20 cents a share. Rice profited greatly in his stock selling of the merged company. Rice either wrote or caused to be written the various articles in the Iconoclast, and the rep-

resentations made there are his, as well as Yorston's, who was clearly a party to the conspiracy and signed letters which were used, if he did not actually phrase some of them.

Any impartial examination of this record is convincing that the appellants embarked upon the stock-selling scheme for personal gain, and had little desire for mining copper, beyond a mere appearance of industry which would aid them in stock selling. Their scheme to defraud was unfolded by evidence in an unmistakable way. From the outset, Rice was the leader in the fraud. Yorston willingly entered into the scheme, and throughout remained a part of it. He knowingly participated in it, by not only lending his name, but by his active cooperation. The Iconoclast was Rice speaking. The corporation was the shield behind which Rice attempted to hide. The guilt of all is clear, and the jury's verdict was justified. We should not reverse, unless prejudicial error is assigned and established.

We will now consider, of the many errors assigned, those which require our attention. The appellants have assigned as error, claimed to be prejudicial, that statements in the summation of government's counsel were tantamount to comments by them upon the failure of the individual defendants to testify. In summation, government's counsel said, after reading the testimony given on the trial by appellant Rice's attorney: "Well, for once he (meaning Rice) cannot hide behind Yorston. He is out in the open on the testimony of his own lawyer." Again he referred to the fact that none of the directors were called to the stand by saying: "While we are on that subject [the subject of Weed's failure to testify], which one of the directors of the Idaho Copper Corporation have these defendants called to the stand? Which officer of the Idaho Copper Corporation have these defendants called to the stand? I will tell you." Thereupon he referred to the testimony given by Rice's lawyers. Again referring to appellants' failure to call an engineer who had been consulted by them, counsel said: "While a man with the facts [Thompson] sat back there enshrouded in his own and the defendants' silence."

These references, it is argued, were made in violation of appellants' constitutional (Fifth Amendment) and statutory (section 1465, Comp. Stat. [28 USCA § 632]) protection. Recognizing the protection of each, and the well-settled doctrine forbidding comments on the failure of a defendant to be-

come a witness in his own behalf (Wilson v. U. S., 149 U. S. 60, 13 S. Ct. 765, 37 L. Ed. 650; Reagan v. U. S., 157 U. S. 301, 15 S. Ct. 610, 39 L. Ed. 709; Nobile v. U. S. [C. C. A.] 284 F. 253), even by indirect reference (De Mayo v. United States (C. C. A.) 32 F.(2d) 472), there are several reasons why these statements do not require a reversal of this judgment. Counsel for the defendant Weed, in his zealous summation, brought forth much of this comment. There was no objection to reading the opening of Weed's counsel to the jury. The remark about the testimony of the two lawyers was objected to, but the statement was all in legitimate argument. Rice was not a director or an officer of the company. There were other directors who did not testify. The government attorneys were well within their rights in answering the summation of appellants' counsel and pointing out that the testimony remained unanswered. Kearns v. United States (C. C. A.) 27 F.(2d) 854; Schwartz v. United States (C. C. A.) 294 F. 528; Robilio v. United States (C. C. A.) 259 F. 101; Bradley v. United States (C. C. A.) 254 F. 289; Lefkowitz v. United States (C. C. A.) 273 F. 664. Comments made, to which no objections were made or exceptions taken at the time of the trial, will not be sustained as reversible, unless prejudicial error is disclosed. None such appeared here. Chadwick v. United States (C. C. A.) 141 F. 225; Crumpton v. United States, 138 U. S. 361, 11 S. Ct. 355, 34 L. Ed. 958.

■ Error is charged because of statements of the government's counsel in his summation with respect to the consolidation before referred to. In the course of his remarks, counsel referred to the merger after April 6, 1926, and said: "This Iron Dyke accessory, into a merger with other people connected with other mines, and that makes another story which my office and the Post Office Department have. * * * If we have to go into other matters, we will go into them, but that is the situation here presented." He thereupon explained that the conspiracy ended, as charged in the indictment, on April 6, 1926, and "we stopped at that point because the story of this conspiracy stopped there, and we cannot try under the rules of law two conspiracies at once; we will take care of the other in good time." These remarks were fair comment in answer to the remarks in the summation of counsel for the defendant Weed. The appellants had introduced evidence as to this merger and the properties there combined, and sought to obtain the benefit from this testimony. With the evidence thus introduced by the appellants, it was proper argument for counsel to refer to that merger and characterize it as he did.

■ Complaint is made of the court allowing the testimony of victims as to what they paid for stock and at what price they sold it, thus establishing their loss. Many authorities are referred to, pointing out that it is not necessary for the government to show the loss to establish the crimes here charged, but in establishing the fraudulent scheme this evidence was competent. The offense is based on the scheme to defraud the victims. To show that the appellants did defraud, the losses suffered by the victims is part of the event which might well be told. It is difficult to see how it could be avoided. Appellants did not hesitate to attempt to show gain made by other stockholders.

■ Error is charged for the admission in evidence of the Campbell telegrams sent to the Boston Curb Exchange. These telegrams were notice to the Exchange, by the superintendent of mines of Idaho, of the fraud involved in selling stock. When the committee of the Exchange called the officers of the Idaho Copper Corporation before it, the telegrams were shown to Yorston and to Rice's attorney, who represented the corporation. They were discussed by all, and bore on the question of whether appellants' conduct was honest or otherwise. The good faith of a defendant is always involved in a charge such as this. They were explanatory of the false character of the excuses made by the representatives of the appellants before the Boston Curb Exchange committee. These telegrams, under the circumstances of this case, were statements by an official of the state of Idaho. They were called to the attention of the appellants in the conference, when their conduct was on inquiry by the Boston Curb Exchange. They were relevant and material, as a necessary foundation to show what the appellants said about them at this meeting. Moreover, the appellants offered in evidence minute books of the Idaho Copper Corporation, which made repeated reference to these telegrams, and the damage committed by them constituted the foundation upon which rested the libel suit brought by the corporation against Campbell. They were properly received.

■ Nor was error committed in receiving in evidence the letters of resignation of the three directors, which gave reasons for their action. These letters brought home to the appellants notice of the objectionable affairs of the corporation, and plainly told the ap-

pellants that they were engaged in a stock-selling scheme. Their answer came in the form of boosting articles of the property in the Iconoclast and the villification of the resigning directors. These letters and their contents were a subject of discussion at the meeting with the committee of the Boston Curb Exchange. Indeed, the correspondence became the subject-matter for minutes of the corporation.

There were received in evidence three telegrams sent to the appellant Rice by Weed, which had to do with his discoveries at the mine. These letters were against the claims made for the mine. In one, it was stated: "please go slow on Peacock. Property robbed, dump oxidized and not millable, except by costly sulfidation. Moreover price is altogether out of reason. It is practically valueless to any one but ourselves." This related to the Peacock mine, located at South Peacock. It was some evidence as to the conspiracy charged, of which Weed was one of the alleged conspirators. But the objection to their admission is based upon insufficient identification of the sender, and it was not shown that the telegram reached Rice. There was sufficient identification; it was established that "Retlaw" meant Weed and "Aguin" meant Rice, in the code between the two. There was ample evidence for the jury to find that these telegrams were in the possession of Rice. They were properly received.

It is urged that error was committed by the court below in refusing to instruct the jury as to assumptions it might draw from the failure of either party to produce witnesses. This was fully covered by the court's instructions that "in so far as either party neglected to summon any person who in your judgment should have been summoned and who could have thrown light on this case you may assume or presume that any such person would not have been favorable to the person who should have called him."

The grand jury which found this indictment was summoned under an order dated June 2, 1920, and under which grand juries have been summoned for the past nine years in the district. The order provided: "It is hereby ordered that more than sixty days before the first Tuesday of each month in the year hereafter, or, if such Tuesday be a legal holiday," the grand jury shall be called. It further provided: "It is further ordered that this order may be modified at any time by the special order of this court, but that, unless so modified, it continue in force until the further order of the court."

No further order of the court was entered,

and the appellants contend that the time to legally summon the grand jury ended one year thereafter. But the provisions of the order are continuing, and "it continue in force until the further order of the court." Since it was not vacated, modified, or changed, it was in force and effect when this grand jury found this indictment. Under these circumstances, no prejudice existed against the appellants. Breese v. United States (C. C. A.) 203 F. 824; Rev. St. U. S. § 1025 (18 USCA § 556).

While the jury were deliberating, they requested exhibits which had been offered in evidence—issues of the Iconoclast, the Hancock report, and the Weed letters and telegrams. Counsel on both sides being present, the trial judge, who was absent, was asked over the telephone to give instructions as to this request. He directed that the entire newspapers go into the jury room and that they might have the exhibits. This was done by consent of counsel of each of the defendants on trial. A belated objection on appeal, urging this to be error, is now presented. The objection is that the trial judge was not personally present in the courtroom throughout the entire trial, and therefore that denied the appellants a trial by jury, due process of law, and a public trial. No such constitutional guaranties were breached by what transpired. The exhibits went in by consent of counsel. This was sufficient. Dodge v. United States (C. C. A.) 258 F. 300, certiorari denied 250 U. S. 660, 40 S. Ct. 10, 63 L. Ed. 1194. The failure of the trial judge to be present is not fatal to the judgment. It was a harmless error, if one was committed, which involved no substantial rights of the parties. Section 269 of the Judicial Code as amended, 28 USCA § 391.

Much has been said by counsel on the oral argument, and much more in the briefs in support of the alleged unfair and prejudicial trial, which was conducted below and resulted in convictions. We have examined this very long record, and in detail various references which constitute the alleged unfair trial. In effect the charge is that the government attorney was uncurbed in his attack made upon the appellants, and that one of the attorneys for an appellant, who testified, was coerced into giving testimony while in the judge's chambers, because of threats made there as to his violations of the law in failing to make return of his income tax; that the trial court displayed great ardor in reproving counsel for the appellants, and did not require like conduct from the government's counsel. It is unnecessary to examine

these charges at length. It is sufficient to say that there was no display of unjudicial demeanor in the conduct of this trial by the learned judge below.

In order to keep this very long trial within some bounds of limit, it became incumbent upon the judge to at times reprove counsel in his examination of witnesses. This is what is expected of a strong trial judge. Newman v. United States (C. C. A.) 28 F. (2d) 681; Kirk v. United States (C. C. A.) 280 F. 506. Nothing in the record justifies the alleged intimidation of one of the trial counsel, who became a witness for the defense. This trial lasted five weeks, and a large record was accumulated. Learned counsel, in their industry, have endeavored to point out substantial errors which would require a reversal of the judgment. The excellency with which this trial was conducted has deprived them of success in that effort. The trial judge exercised patience and displayed an ever-present desire to shield the innocent from oppression or successful persecution. His charge to the jury was consistent with the display of impartiality exhibited throughout the trial.

There are numerous other assignments of error, some of which have been briefed and argued. We have examined them all, but it would unduly lengthen this opinion to write as to all. It is sufficient to say that we find no error in the many assigned.

The convictions are affirmed; mandate will issue forthwith.