## UNITED STATES v. BROWN et al. *
### No. 463.

Circuit Court of Appeals, Second Circuit.
July 29, 1935.

*Certiorari denied 56 S. Ct. 531, 80 L. Ed. ——.

322

Phillips, Mahoney, Leibell & Fielding, of New York City (Walter Bishop, Jeremiah T. Mahoney, and P. E. Conforti, all of New York City, and Sidney Masone, of Brooklyn, N. Y., of counsel), for appellants.

F. W. H. Adams, U. S. Atty., of New York City (Jacob J. Rosenblum, Asst. U. S. Atty., Craigh Leonard and Richard Delafield, all of New York City, of counsel), for the United States.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

Brown and McCarthy were indicted on October 3, 1930, with four others who were not tried. The crime charged was the use of the mails in a scheme to defraud, section 338, title 18, U. S. Code (18 USCA § 338); and the indictment was in nine counts, each charging the posting of a separate letter, to which was added the usual count in conspiracy. The cause came on for trial in November, 1933, after a demurrer had been overruled, and was concluded in January, 1934, by a verdict against the defendants upon eight of the nine posting counts (one being withdrawn), and upon the conspiracy. On January 19, 1934, the court sentenced them to a term of five years upon all the counts, together with fines amounting to $18,000.

The facts developed upon the trial and really undisputed were as follows: In December, 1929, Brown had bought 43,400 shares in a company known as the Manhattan Electrical Supply Co., Inc., of which he was president, he had an option upon 27,500 more at $27.50, and a somewhat indefinite arrangement with one Anderson affecting an added 20,000. The company had 125,000 shares outstanding, listed on the New York Stock Exchange, which had been actively traded in, and whose price had before this period fluctuated with great violence due to the manipulation of an earlier pool two years before. McCarthy became associated with Brown in December and both determined to work off the shares at constantly rising prices. To accomplish this they opened ninety-one accounts with fifty-two different brokers, in their own names and those of their wives, and in the names of others who were their creatures. A single set of books contained all the purchases and sales, and the defendants furnished the bulk of the money to carry the shares, which were bought on margin. The most serious of the frauds practised were bribing brokers and their assistants to recommend the stock, and "washing" sales in it. Brokers have managers, clerks and so on who deal directly with their customers, and on their advice the customers rely in investing; these employees are called "customers' men," and the defendants either paid them salaries or a commission for advising the purchase of Manhattan shares. "Washing" sales was made possible by the numerous accounts controlled by the defendants between whom transactions could be cancelled. In addition to these frauds the defendants put out false statements of the earnings of the company; e. g., that for the year 1930 it had earned between six and ten dollars a share and would soon pay a dividend, though in fact it had lost money during the first quarter of 1930. They also declared that the company had large contracts in prospect. By these means they forced up the price to 55 on May first, when it became apparent that the end was at hand. Trading closed until the seventh when the stock opened below 20 and never recovered. The public was successfully gulled, and during the four months while the plan was afoot rushed in to buy the shares in great quantity. The defendants do not argue that all this did not make a case for the jury; they rest their appeal upon points of law as follows: First, they say that the indictment did not charge a crime at all. Second, that certain damaging newspaper articles were improperly received in evidence against them. Third, that the testimony of those who had bought the shares and lost their money, was irrelevant and damaging. Fourth, that a juror had misconducted himself during the trial. Fifth, that the judge misdirected the jury on the law, and assumed too strict a control over their decision upon the facts. We shall take these up seriatim.

The challenge to the indictment, first raised by demurrer, was in two parts; that one allegation was too indefinite, and that as a whole it did not lay a crime. The first rests upon this passage: "It was a part of said scheme * * * that the defendants would form a pool * * * for the purpose of artificially manipulating the market in the stock * * * so as to artificially advance and inflate the price thereof without regard to the real value * * * from approximately twenty dollars per share to several times its then selling price." The objection is that there is no allegation of what the "real value" was. The excerpt is only a small part of the scheme which included bribing the "customers' men," a somewhat defective effort to allege "wash" sales, and misstatements about the company's earnings, the prospect of a dividend and the prospective contracts. It is doubtful whether the whole passage alleges any fraud at all, and if so, it is bad regardless of the point raised on the appeal. What does "artificially" mean, or "manipulated"? What misstatement of existing fact do they charge? No doubt a rhetorical implication of dishonesty hangs about them, but is that enough? We need not answer, for the language quoted was in any view surplusage, and might be disregarded. For the same reason we need not enter into a general discussion of the lawfulness of stock "pools," as the judge did below. There are various kinds of these; some merely hold a block of shares off the market for a season; some "peg" the price, buying when it falls, selling when it rises; others resort to less innocent methods. We leave the matter open, for the indictment contained enough else, as we have just said.

The objectionable newspaper articles were admitted under the following circumstances: Brown, who was the principal in the enterprise, employed a writer, named Lawn, to prepare favoring articles about

the stock for insertion in newspapers and other publications, hoping to keep the public well disposed and to maintain a buyers' market. The New York Sun and the New York Journal published articles in their financial columns at the very end of April, 1930, just before the bubble burst, in which they severely criticized the methods used by the pool in disposing of the shares, intimating that the price had been raised far beyond the value by false "publicity." Lawn, being concerned about the effect of these, showed them to Brown and along with them answers which he had got up for publication. Brown read them and Lawn's proposed answer and told him not to use it; but he sent out a short answer of his own deprecating the attacks. Later one Deschler, a buyer of shares, spoke to Brown about one of the articles and Brown told him not to be troubled and not to sell his shares. The articles taken alone were of course incompetent; to be admissible at all they must become admissions of Brown. It was not enough that he merely learned of them; it was necessary that some reasonable inference relevant to the facts should be possible from his subsequent action or inaction. His direction to Lawn not to publish Lawn's answer cannot be taken as an admission of the truth of the charges; that would be a dreadful penalty for silence in the face of irresponsible attack. But his own answer was different; it was clearly to induce customers to buy, or at least not to sell; an effort to soothe the alarm which the articles might arouse, and the articles were essential to its understanding. This is especially evident in the interview with Deschler, who was troubled and thought of selling out. Brown reassured him and perhaps succeeded in keeping his shares off the market. Myers v. U. S., 223 F. 919, 923 (C. C. A. 2); Rice v. U. S., 35 F.(2d) 689, 695 (C. C. A. 2).

 A more serious matter was the testimony of those who had lost money by buying the shares. To my own knowledge it has been a custom for over twenty-five years in the Southern district of New York to admit such testimony in this class of cases; it is extremely telling, especially as the prosecution invariably selects the most pitiful cases. Yet it is difficult to see what bearing it can have upon the crime. The prosecution need not prove damage [Linn v. U. S., 234 F.. 543 (C. C. A. 7); Stunz v. U. S., 27 F.(2d) 575 (C. C. A. 8); Foster v. U. S., 178 F. 165, 173 (C. C. A. 6)],

and the evidence concerns nothing else. No doubt buyers may be asked whether they received letters and other communications from the accused; these are the false utterances and are necessary to the liability. Conceivably it may be relevant to show that after purchase the shares collapsed in value, on the theory that this helps to prove that they had no value when the accused recommended them; though it must be confessed that the probative force is not very great. Be that as it may, we have twice sustained the admission of such testimony [Rice v. U. S., 35 F.(2d) 689 (C. C. A. 2); U. S. v. Shurtleff, 43 F.(2d) 944 (C. C. A. 2)], and although we once protested against its excess [Myers v. U. S., 223 F. 919, 922 (C. C. A. 2)], we shall adhere to our former ruling until the Supreme Court decides otherwise. But we have never held that the witnesses should be allowed to go to such lengths as here, and plainly they should not. For example, the prosecution succeeded in getting before the jury that in consequence of their losses some buyers had lost their homes and their business, and gone hopelessly into debt; that they had lost everything including their friends, and were destitute; that their losses went into millions; that one unfortunate had committed suicide. Were the guilt of the accused not so irrefragibly shown, we could not affirm the judgment in the face of this, and we wish to make it clear that we have never given warrant to any such abuse. All we sanction is evidence that the property bought turned out to be worthless, or that it greatly fell in value.

 The supposed misconduct of a juror during the trial deserves little notice. He went to a barber who asked him how the trial was going and whether Brown would be convicted. Most indiscreetly he answered, "I think so." The effort is to persuade us that this showed a premature conclusion by the jury, and for that reason deprived the defendants of an impartial trial. It is to be noted that this remark was not an expression of a separate opinion to which the juror might feel himself committed; it was merely a forecast of the verdict, which could hardly be more than a provisional guess. However undesirable it may be for jurors to talk about the cause at all, this was the kind of inference that was almost unavoidable as the case progressed, and it is difficult to treat the objection seriously.

Aside from the testimony as to losses, the only errors of any substance were in the judge's charge. The defendants complain, as defendants commonly do, that he obtruded his own views too much, but that is baseless. Again and again he repeated, and that too in no perfunctory way, that in the end the jurors must decide the facts. He did indeed say frankly what he thought about some of the testimony, but it can scarcely be necessary to repeat that in that he was within his province; he did not use that power to be held so much in reserve—his opinion as to the defendants' guilt. United States v. Murdock, 290 U. S. 389, 54 S. Ct. 223, 78 L. Ed. 381. But his charge was less impregnable when he came to define the crime, and it will be necessary to discuss this a little at length. The crime was deceit, and we agree with the Eighth circuit that the liability runs pari passu with civil liability. Foshay v. United States, 68 F.(2d) 205, 211 (C. C. A. 8). The Supreme Court has not indeed said so expressly, but that seems to us to be the presupposition of Durland v. U. S., 161 U. S. 306, 16 S. Ct. 508, 40 L. Ed. 709, and U. S. v. Comyns, 248 U. S. 349, 39 S. Ct. 98, 63 L. Ed. 287; and we have ourselves so treated it. U. S. v. Rowe, 56 F.(2d) 747 (C. C. A. 2); Pelz v. U. S., 54 F.(2d) 1001 (C. C. A. 2). Cf. Harrison v. U. S., 200 F. 662, 665 (C. C. A. 6). It was therefore necessary for the prosecution to allege and prove utterances about existing facts which were untrue and known to be so. As we have said, the only deceits alleged with enough clarity to serve at all were bribing "customers' men," "washing" sales, and misstating the earnings of the company and its prospective contracts. As to bribing the "customers' men" the deceit consists of this: When a prospective buyer comes to a broker for advice he supposes that what he gets is an opinion unweighted by personal interest. To pay the broker to advise the purchase of a specified stock is to bribe him to misrepresent a fact, to wit, that his corrupted advice is not corrupted. "Wash" sales are a deceit, because they broadcast the fact that a buyer and a seller have agreed to exchange the shares at the published price, when they have not done so. An entirely adequate charge should have explained these issues to the jury, so that they could know what they had to decide.

The judge began by saying that the crucial "question was of fair dealing between man and man"; that was to be the "dominant note." After reading to them the statute and saying that the crux of the charge was a scheme to defraud, he told them that fictitious sales and false returns figured in the scheme alleged. It was enough if the utterances of the accused were calculated to deceive persons of ordinary capacity; any false statement was indeed enough, if part of a plan or scheme. If the representations were made honestly there was no crime, people must be deceived "as to the substantial identity or value of the thing which they are to receive." This was based upon Harrison v. U. S., 200 F. 662 (C. C. A. 6), supra. It would do, "if there be actual misrepresentations as to an existing fact." The question was whether the fictitious sales of stock were a false representation. People selling property were held to "a very high standard of accuracy and honesty." Were the defendants' statements "made with reckless disregard of their truth or falsity"? Had they "made necessary inquiry to assist them in learning the truth or falsity" of what they said? What he wished again and again to refer to was "whether the defendants have been guilty of violating the right of open and fair dealing"; he begrudged the time taken to define the crime, which he did define only "to comply with the rulings of the higher courts." An outsider reading price quotations was justified in supposing that they represented "actual sales" and so "a valuation of the stock on the market." When a stock was "artificially raised by massaging the market" buyers paid more than if the transactions were "fair and open"; "the rule of dealing * * * is fair dealing;" even a speculator was entitled to be safe from misrepresentation, for "fair dealing applies to dealings with all men." A buyer was "unfairly dealt with" when the price was raised by "wash" sales. Did the defendants "deal fairly" with those who bought the shares? Pools might be lawful; the question was whether this pool "infringed the right of fair dealing"; what went on "behind the scenes" would determine that. When "people try to control price * * * they have to act with meticulous honesty * * * to keep themselves within the zone of fair dealing." He then went over the evidence in some detail dwelling upon those "customers' men" who had been bribed, adding that "fictitious sales * * * were indulged in to a most

extraordinary extent." Could the defendants "have really believed what they said, or were they merely making reckless promises"? The jurors might "not escape the feeling that there was not that meticulous accuracy of statement required in dealing with others, and that they were making exaggerated statements based on hopes probably unrealized."

We have tried to sum up the charge as a whole, for it is obviously unfair to cull out a phrase here and there, seeking to make it appear that the judge had said nothing more than that the accused might be convicted for lack of "open and fair dealing." It sufficiently appears, we think, that the gravamen of the charge was deceit, depending chiefly upon bribing the "customers' men" and the "wash" sales. When in this background the judge mentioned "fair dealing," the more natural, though we agree not the inevitable, meaning was, not that he meant to set up another standard than deceit, but that he was thinking of "fair" dealing as "honest dealing," and "honest" dealing as the contrary of the conduct he had been describing. He was not asked to define the particulars, and though his remarks would certainly have been clearer had he done so, the defendants cannot complain that he did not. There were indeed a few passages not felicitously phrased, e. g., those seeming to demand "meticulous accuracy"; but when read as a whole the charge does not seem to us really to leave the essentials in doubt.

█ Moreover, even though the judge was wrong in spots, the case is within section 391, title 28, U. S. Code (28 USCA § 391). The crime was so indisputably proved that no honest jury could fail to convict. The "wash" sales were proved from the brokers' books and could not be denied. The testimony as to bribing "customers' men" was not so indisputable, it is true; a good deal of it came from the mouths of codefendants, and in a sense all who accepted the bribes were accomplices. But if the witnesses were believed the crime was proved, and any confusion in the charge about "fair dealing" or "meticulous accuracy" did not touch their credibility. The conduct they swore to was criminal, and the chance of the jurors being misled as to the proper standard was extremely remote. Again the fact that the company had not been making any profits was proved from the books; proved it is true by an accountant, but subject to disproof and not challenged. Thus the charge was indubitably true; had the cause been civil the judge would have been obliged to direct a verdict for the plaintiff. It was to prevent miscarriages of justice such as a reversal would here be that section 391, title 28, U. S. Code (28 USCA § 391), was passed. When the very merits of the case are clear; when only one result can honestly emerge; and when the jury has in fact been satisfied, we no longer look upon criminal procedure as a sacred ritual, no part of which can be omitted without breaking the charm. Trial by jury is a rough scales at best; the beam ought not to tip for motes and straws.

Judgment affirmed.